UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

VICTOR F. LAU,                                    :

                 Plaintiff,            :          <u>OPINION & ORDER</u>

           -against-                :
                                      17 Civ. 8564 (GWG)
COMMISSIONER OF SOCIAL SECURITY,       :

               Defendant.         :
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Victor Lau, proceeding pro se, brings this action pursuant to 42 U.S.C. § 405(g)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for disability benefits under the Social Security Act (the

"Act"). The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule

of Civil Procedure 12(c), which Lau has opposed.[1] For the reasons stated below, the

Commissioner's motion is granted.

I. <u>BACKGROUND</u>

     A. <u>Procedural History</u>

Lau applied for Disability Insurance Benefits ("DIB") on August 1, 2014, alleging a

disability onset date of May 1, 2012. <u>See</u> Certified Administrative Record, filed Apr. 9, 2018

(Docket # 16) ("R."), 9, 68, 142. The Social Security Administration ("SSA") denied Lau's

application for DIB on October 14, 2014. R. 9, 77-81. Lau requested a hearing before an

administrative law judge ("ALJ") to review the denial, R. 83-85, which occurred on September

---

[1] Notice of Motion, filed Apr. 9, 2018 (Docket # 14); Memorandum of Law in Support
of the Commissioner's Motion for Judgment on the Pleadings, filed Apr. 9, 2018 (Docket # 15)
("Comm'r Mem."); Opposition to the Commissioner's Motion for Judgment on the Pleadings,
filed June 11, 2018 (Docket # 17) ("Pl. Mem.").

8, 2016, R. 28-66.  In a written decision dated September 23, 2016, the ALJ found that Lau was

not disabled between May 1, 2012 — his alleged disability onset date — and December 31, 2014

— his date last insured.[2]  R. 9-16.  Lau requested that the Appeals Council review the ALJ's

decision, R. 137-40, 236, but on October 18, 2017, the Appeals Council denied Lau's request, R.

1-5.  That made the ALJ's decision the final decision of the Commissioner.  R. 1.  Lau timely

filed this action on November 2, 2017.  See Complaint, dated Nov. 2, 2017 (Docket # 2).

     B.  Hearing Before the ALJ

Lau was represented by non-attorney representative Jerry Adler at the hearing before the

ALJ.  R. 30.  Also present and testifying were two medical experts, Dr. Osvaldo Fulco and Dr.

Sharon Grand, and a vocational expert ("VE"), Michele Erbacher.  R. 30.

Lau testified that prior to the onset of his allegedly disabling conditions he had worked

consistently for at least ten years as a computer programmer and systems engineer at various

companies, having completed a bachelor's degree in China.  R. 33-37.  His last job in computer

programming was at Blue Cross Blue Shield, which laid him off in May 2009 when the company

outsourced its programming work to India.  R. 34-35.

Lau explained that he developed a persistent and heavy cough after he was laid off,

which he feared was a sign of lung cancer, R. 38-39, but might have been lung damage "related

to the 9/11 attack," R. 41, 47-48.  He said the cough caused insomnia and at one time he went six

straight months without sleep.  R. 40.  Otherwise, Lau did not attribute any physical limitations

to the cough.  R. 38-40.  To treat his cough, Lau said his doctor recommended that he use

---

    [2] Unlike the supplemental security income program, which contains no insured status requirement, see generally 20 C.F.R. § 416.202, a claimant is eligible for DIB only if that claimant had "disability insured status in the quarter in which [the claimant] became disabled or in a later quarter in which [the claimant is] disabled," 20 C.F.R. § 404.131.

"asthma spray" and prescribed antibiotics. R. 41. His doctor also recommended surgery, which Lau declined. R. 41. Lau also testified to having high blood pressure for which he takes an alpha beta blocker. R. 42.

Lau also talked at length about his psychiatric treatment. He explained that he first saw a psychiatrist "at the beginning of 2015," when the Human Resources Administration referred him to "several psychiatrists" after he applied for Medicaid. R. 42. Thereafter, he saw various psychiatrists with some consistency. R. 42-44, 46-47. One psychiatrist, whom he saw for his insomnia, told him that his insomnia was "a severe mental problem . . . close to bipolar," for which the doctor prescribed him Seroquel. R. 40. Lau was also prescribed Haldol. R. 43. Lau explained that he was anxious about "everything," including people following him. R. 47. He thought the government had been following him since he "joined the Occupy Wall Street in 2011," and feared that the government would "disappear" him as it had done to others. R. 48-49.

Lau testified that he lived in a homeless shelter where he had his own room but shared common living spaces with the other residents. R. 32-33. Because of the limited facilities at the shelter, he does not cook or clean. R. 44. For recreation, he walks in the park when it is warm and otherwise stays at the shelter "watch[ing] some games and watch[ing] some movies [and] TV," though he struggles to concentrate. R. 45. Because he "sometimes just lose[s] [his] mind in the library," he will "fall asleep" and be kicked out by a librarian. R. 46. He does not see friends or relatives. R. 45. As for transportation, Lau said that he rarely uses public transportation because he "just feel[s] unsafe" since "[a] lot of people [have been] pushed out on the track," R. 45; rather, he drives and owns a car, R. 44-45.

Dr. Grand, identified as a "mental health medical expert," R. 12, testified that the record supports Lau's diagnosis for "schizophrenia, paranoid type and a hoarding disorder." R. 50-51.

In her view, Lau's schizophrenia met listing 12.03, because Lau reported persistent delusions and paranoia, was unable to maintain a residence, was hoarding in his room at the shelter, and had marked difficulties in maintaining social functioning. R. 51-52. Dr. Grand believed Lau met the listing as far back as January 2015, but no earlier because "[i]t's not documented clearly." R. 52-53. "It seems likely" that it started before January 2015, she testified, but said she could not speak to any functional limitations before January 2015 because of the lack of documentation. R. 53.

Dr. Fulco, a medical doctor who reviewed Lau's records, testified that Lau may have developed "reactive airway disease" after working at Ground Zero for about two months after 9/11. R. 55. "[T]he evidence is sufficient . . . to establish th[is] diagnosis," which he explained is "classic of individuals that were exposed to the dust, fumes, and chemicals in very, very high concentration that occurred [at] Ground Zero." R. 56. As a result of this disease, the "bronchial [tubes] become extremely sensitive to any kind of inhalants," often causing a cough "so severe that it may interfere with the ability to complete . . . an eight-hour day." R. 56. But he noted "that is my opinion on this," because the record did not contain a test, usually called methacholine provocation, which would confirm the diagnosis. R. 56. He contended that the various chest x-rays which reported normal results were "not inconsistent with [his] opinion that the claimant has reactive airway disease" and that as a result of this disease, Lau could not work "even going back to 2012." R. 57. This opinion was based on Lau's consistent self-reporting of a heavy cough. R. 58.

The ALJ asked VE Verbacher to consider whether a person of Lau's age, education, and work history who is "limited to the performance of medium work" and who could not be exposed to "pulmonary irritants" could perform Lau's past work as a programmer. R. 63.

Verbacher said such a person would have difficulty finding suitable jobs.  R. 64.  But if such person could "occasionally" be exposed to pulmonary irritants, then that person would be able to perform Lau's past work.  R. 64.

C.  Medical Evidence

Both Lau and the Commissioner have provided summaries of the medical evidence in the record.  See Pl. Mem. at 2-6; Comm'r Mem. at 5-14.  While the Commissioner's summary is more detailed, Lau's summary is substantially consistent with it.  Accordingly, the Court adopts Lau's and the Commissioner's summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in section III below.[3]

D.  The ALJ's Decision

The ALJ denied Lau's application for DIB on September 23, 2016.  R. 6-16.  Following the five-step test set forth in SSA regulations, the ALJ found at step one that Lau had not engaged in "substantial gainful activity" during the time between his alleged disability onset date — May 1, 2012 — and his date last insured — December 31, 2014 (the "Relevant Period"). R. 11.  At step two, the ALJ found through the date last insured that Lau suffered from the "severe impairments" of "restrictive airway disease and hypertension."  R. 11.  Because the record contained "insufficient evidence prior to [Lau's] date last insured documenting significant functional limitations arising from his mental impairments," the ALJ concluded that Lau did not suffer from a severe mental impairment during the Relevant Period.  R. 11-12.

At step three, the ALJ found that none of Lau's severe impairments singly or in

_____

[3]  Lau also cites to news articles and government websites outside the record, see Pl. Mem. at 1-2, but this evidence is not relevant to his claims and thus we do not address it.

combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart p, Appendix 1.  R. 13.  The ALJ gave "particular attention . . . to listings 3.02 and 4.01," which address "chronic pulmonary insufficiency" and "impairments of the cardiovascular system," respectively.  R. 13.  Having found that Lau could not meet listings 3.02 and 4.01, the ALJ next assessed Lau's residual functional capacity ("RFC").  R. 13.  The ALJ found that Lau, through the date last insured, had the RFC "to perform medium work . . . with additional restrictions insofar as he could have no more than occasional exposure to pulmonary irritants, dust, odors, fumes, and extremes of heat and cold."  R. 13.  In making this assessment, the ALJ reviewed the medical record, including the opinions of all consulting, examining, and treating medical sources; and Lau's testimony, finding Lau's testimony "not entirely consistent with the medical evidence and other evidence in the record."  R. 14.  At step four, the ALJ found that Lau could return to his prior work as "a program analyst for web applications."  R. 16.  Since he could perform his prior work, the ALJ concluded that Lau was not disabled within the meaning of the Act during the Relevant Period.  R. 16.

## II.  GOVERNING STANDARDS OF LAW

### A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

It is not a reviewing court's function "to determine de novo whether [a claimant] is disabled."  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).  Rather, a court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370,

374-75 (2d Cir. 2015) (per curiam); <u>see generally</u> 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>accord</u> <u>Greek</u>, 802 F.3d at 375; <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008); <u>Matthews v. Leavitt</u>, 452 F.3d 145, 152 n.9 (2d Cir. 2006); <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." <u>Johnson v. Astrue</u>, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise</u>." <u>Id.</u> (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." <u>Johnson</u>, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

B.  Standard Governing Evaluation of Disability Claims by the Agency

The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his or her "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic

work activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his or her age, education, or work experience.  See id. § 404.1520(a)(4)(iii), 404.1520(d).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC permits the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

The Commissioner argues that substantial evidence supports the ALJ's decision. Comm'r Mem. at 16.  Lau's brief argues that the ALJ ignored or mischaracterized evidence in his favor, see Pl. Mem. at 10-11, which we construe as an argument that the ALJ's decision was not supported by substantial evidence, id. at 10-14.  Because we find substantial evidence supports the ALJ's opinion, we grant the Commissioner's motion.

A.  Substantial Evidence for Finding Lau's Mental Impairment Non-Severe

We start by evaluating Lau's claim that the ALJ should have found that he had the severe impairment of paranoid schizophrenia during the Relevant Period, and in turn, that this impairment was so severe as to render him disabled either at step three or step four.  See Pl.

Mem. at 10-11.

At step two, the ALJ found that Lau suffered from only "restrictive airway disease and hypertension" through December 31, 2014, his date last insured. R. 11. The ALJ acknowledged that "[t]he record establishes that the claimant suffers from psychiatric symptoms," but found that "[p]rior to 2015, the record fails to establish that the claimant's alleged anxiety and insomnia, considered either singly or in combination, caused any more than minimal limitations in the claimant's ability to perform basic mental work activities." R. 11-12. In support of this conclusion, the ALJ looked to records from Lau's various treating mental health professionals and accepted that "the records from these treating sources sufficiently document severe psychiatric impairments in 2015 and 2016." R. 12. Nonetheless, he accorded those opinions "little weight with respect to [Lau's] mental functioning prior to his date last insured." R. 12. In particular, he discounted the opinions of Dr. Adriel Gerard and Dr. Sharon Eberstein because they "did not begin treating [Lau] until 2016, and [thus] were not in a position to adequately evaluate his mental functioning" before then. R. 12. The ALJ also considered the four functional areas set forth in the Commissioner's regulations for evaluating mental disorders, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C. R. 12. "[A]fter consideration of all the evidence," however, the ALJ found "that the claimant had no more than mild limitation[s] in these functional areas during [the Relevant Period] . . . [and no] episodes of decompensation." R. 12. Additionally, the testimony of Dr. Sharon Grand, who testified that the record did not reveal any severe mental impairments prior to 2015 when Lau began to live on the street, supported this conclusion. R. 12.

Under the Commissioner's regulations, an alleged impairment is "severe" only "if it significantly limits an individual's physical or mental abilities to do basis work activities." SSR

10

96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1520(c).  A "non-severe"

impairment is one that is "a slight abnormality (or a combination of slight abnormalities) that has

no more than a minimal effect on the ability to do basic work activities."  SSR 96-3p, 1996 WL

374181, at *1; accord Bowen v. Yuckert, 482 U.S. 137, 154 n.12 (1987).  Basic work activities

include the following: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out and remembering

simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-

workers and usual work situations."  Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012)

(alterations in original) (internal quotation marks omitted) (quoting Gibbs v. Astrue, 2008 WL

2627714, at *16 (S.D.N.Y. July 2, 2008)) (citing 20 C.F.R. § 404.1521(b)).  "[T]he mere

presence of a disease or impairment, or establishing that a person has been diagnosed or treated

for a disease or impairment, is not, by itself, sufficient to render a condition 'severe.'"  Taylor,

32 F. Supp. 3d at 265 (internal quotation marks omitted) (quoting Coleman v. Shalala, 895 F.

Supp. 50, 53 (S.D.N.Y. 1995)).

　　　Where a mental impairment is at issue, the Commissioner has promulgated a "special

technique" which ALJs must follow prior to deciding whether a mental impairment is severe or

not.  See 20 C.F.R. § 404.1520a(a) (2011); Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir.

2008).  That technique requires an ALJ to "rate the degree of functional limitation resulting from

the [medically determinable] impairment(s) in accordance" with section 404.1520a(c)(3), which

comprises four functional areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R.

§ 404.1520a(b)(2), (c)(3); Kohler, 546 F.3d at 266.[4] "According to the regulations, if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' . . . ." Kohler, 546 F.3d at 266. The ALJ's findings as to each of these functional areas "must" be incorporated into the ALJ's decision. 20 C.F.R. § 404.1520a(e)(4); accord Kohler, 546 F.3d at 266.

In this case, the ALJ assessed Lau with experiencing only the medically determinable impairments of anxiety and insomnia. Although Lau notes he was diagnosed with paranoid schizophrenia and hoarding disorder, Pl. Mem. at 5, Lau was not diagnosed with either disorder during the Relevant Period. The first record diagnosing Lau with schizophrenia and taking note of his hoarding is from February 2016, see R. 340, well outside the Relevant Period. None of Lau's treating sources diagnosed Lau with these conditions at an earlier period. While Dr. Gerard remarked in a May 2016 medical report that Lau had a "[h]istory of schizophrenia," R. 300, Dr. Gerard also disclaimed at that same visit any knowledge as to when Lau's mental health issues first appeared, see R. 305. Similarly, while Dr. Sharon Eberstein opined that Lau had experienced a "profound decline in social and occupational functioning over the past 10-15 years," she provided no time period when plaintiff's limitations manifested. See R. 393-98. Neither doctor treated Lau prior to 2016. R. 300, 393. Additionally, Dr. Sharon Grand, who testified that she had reviewed Lau's mental health records, opined that Lau met the listings as of

_____

[4] "These four broad functional areas are also contained in the 'paragraph B' criteria for several listed impairments, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00." Vargas v. Berryhill, 2017 WL 2274240, at *2 (W.D.N.Y. May 25, 2017). In other words, "[t]he evaluation of a claimant's limitations in the four functional areas is used to determine whether plaintiff's mental impairment is 'severe' as well as whether the claimant's impairment meets the criteria for a Listed Impairment under step three of the disability analysis. 20 C.F.R. § 404.1520a(c)(3) . . . ." Johnson v. Comm'r of Soc. Sec., 2017 WL 120938, at *9 n.15 (N.D.N.Y. Jan. 11, 2017).

January 23, 2015, on account of his schizophrenia, but declined to diagnose Lau with an earlier

onset because no records so indicated. <u>See</u> R. 50-53 ("And did the claimant have any severe

mental impairment prior to January 2015? It's not documented clearly, but . . . again, it seems

likely, but I really wouldn't be able to speak on what the functional impairments would be

during that time. He certainly had some anxiety . . . and some insomnia going back . . . to

2012."). Accordingly, because of the lack of retrospective diagnoses and any other record

evidence of schizophrenia or hoarding disorder during the Relevant Period, the ALJ could

properly find that Lau did not suffer from such medically determinable impairments during that

period. <u>See</u> <u>Perry v. Berryhill</u>, 2017 WL 5712305, at *6 (W.D.N.Y. Nov. 28, 2017) (because

"there are only sporadic references to schizophrenia in the record and no diagnosis of

schizophrenia," the ALJ committed no error "by finding that plaintiff's alleged schizophrenia

was not a medically determinable impairment."); <u>Talbot v. Colvin</u>, 2015 WL 5512039, at *4

(N.D.N.Y. Sept. 15, 2015) ("since there was no diagnosis of a mental impairment, the

impairment cannot be classified as a medically determinable impairment and the ALJ does not

need to evaluate whether the impairment is severe or not."); <u>see</u> <u>also</u> <u>Flanigan v. Colvin</u>, 21 F.

Supp. 3d 285, 301-03 (S.D.N.Y. 2014) (finding that "absence of medical evidence" supported

ALJ's determination that medically determinable impairment did not exist until after plaintiff's

date last insured).

As for Lau's anxiety and insomnia, the ALJ followed the Commissioner's regulations in

determining that these conditions did not impose more than mild limitations in the four

functional areas and documented those findings in the opinion. R. 12. This finding was

supported by the absence of significant medical treatment for these impairments during the

Relevant Period. <u>See</u> <u>Reynolds v. Colvin</u>, 570 F. App'x 45, 46 (2d Cir. 2014) (summary order)

("A lack of supporting evidence . . . where the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits."). Lau reported to Dr. Daniel Knoepfmacher that he was seen by a psychiatrist in 2006 and 2007 who prescribed him Zoloft, but did not explain why and also informed Dr. Knoepfmacher that he stopped taking Zoloft after a year. See R. 309. Thereafter, the next mention in the record of insomnia or anxiety is in August 2012, but the treating source, Dr. Cynthia Tam, does not document any specific treatment for Lau's mental impairments. R. 276. A 2014 consultative examiner report noted that Lau was then taking Sertraline, also known as Zoloft. R. 240. The first psychiatric notes appear in the record in August 2015, outside the Relevant Period. R. 285. At that time, the treating psychiatrist, Dr. Andrew Chan, diagnosed Lau with "Anxiety Disorder" and noted that Lau was taking Seroquel and Klonopin. R. 285. It was only in late 2015 that Lau began serious treatment for any mental impairments. See R. 284-87 (Dr. Chan's notes). The almost total absence of corroborating records during the Relevant Period plainly undermines Lau's claim that his insomnia and anxiety represented severe conditions. See Navan v. Astrue, 303 F. App'x 18, 20 (2d Cir. 2008) (summary order) ("the ALJ appropriately relied on the near absence of any medical records between March 1997 and June 1999 to find that [claimant's] claims of total disability were undermined by his failure to seek regular treatment for his allegedly disabling condition"); Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989) ("[Plaintiff's] failure to present any medical evidence from that period seriously undermines his contention that he was continuously disabled during that time.").

The ALJ's finding was also supported by the opinion of Dr. Grand concerning Lau's anxiety and insomnia. Dr. Grand testified at Lau's hearing that Lau "certainly had some anxiety . . . and some insomnia going back . . . to 2012," but she stated that she could not find any

disabling limitations going back beyond January 2015 which was when Lau started living in a shelter. R. 52-53. When asked specifically about Lau's insomnia and anxiety, she said the record, in her view, showed no resulting limitations. R. 53. The ALJ could appropriately choose to give Dr. Grand's opinion great weight.

Finally, Lau's self-reported activities of daily living and functioning supports the ALJ's determination that his insomnia and anxiety were not severe impairments during the Relevant Period. In his function report, dated August 2014, Lau wrote that he lived independently in a basement room of a town house, that he exercised outside in a park "almost every day," visited the library, prepared his own food, and read books at home. R. 184-85. He also denied any problems performing activities of self-care, like dressing or bathing; said that he could drive a car, go shopping, and could take care of his own money; and denied any memory problems, problems following instructions, or completing tasks. R. 185-92. Lau reported engaging in similar activities to Dr. Linell Skeene in that same month. R. 241 ("He is able to shower, bathe, and dress independently. The claimant cooks, cleans, does laundry, and shopping, but no childcare. He watches TV and reads in his spare time."). While Lau also indicated that his insomnia caused him to take naps during the day, disclaimed any social activities, stated that he was being evicted from his home, and said that he finds it hard to concentrate after a bad night's sleep, R. 184-91, these statements do not detract from the ALJ's conclusion that Lau's lack of social contacts and eviction were not evidence of more than mild impairment in the area of social functioning. Likewise, with respect to his difficulty concentrating, a stray and unquantifiable assertion that Lau found it "hard to [concentrate]" does not, on its own, require the ALJ to find moderate limitations in concentration. It is well-settled that "conflicts in evidence . . . are for the commissioner to resolve." Taylor, 32 F. Supp. 3d at 266 (citation and

internal quotation marks omitted). As already noted, the question is not whether Lau has pointed to evidence — even substantial evidence — to support his position, because even if we find substantial evidence supporting the claimant's position, we still must uphold the ALJ's decision if substantial evidence supports the ALJ's decision. Johnson, 563 F. Supp. 2d at 454. To overturn an ALJ's conclusion we would have to find that it did not "rest[] on adequate findings supported by evidence having rational probative force." Taylor, 32 F. Supp. 3d at 266 (citation and internal quotation marks omitted). Here, for the reasons already described, the ALJ could properly find that Lau exhibited no more than mild limitations in the four functional areas during the Relevant Period. See, e.g., Eby v. Colvin, 227 F. Supp. 3d 275, 278-79 (W.D.N.Y. 2017) (reports that claimant can perform "most activities of daily living" and can "focus on leisure activities, such as video games," supported a finding of mild to moderate limitations in four functional areas). We thus find no error in the ALJ's finding that Lau's anxiety and insomnia were non-severe impairments.

B. Substantial Evidence for ALJ's Step Three and RFC Findings

The ALJ found at step three that Lau's impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 13. Specifically, he examined Listing 3.02, Chronic Respiratory Disorders, and Listing 4.01, Cardiovascular Impairments, finding that Lau did not exhibit the necessary findings. R. 13. This decision was supported by the substantial evidence in the record.

Under Listing 3.02(A), a claimant of Lau's height may demonstrate per se disability if they have a forced expiratory volume ("FEV") in one second equal to or less than 1.60. 20 C.F.R. Pt. 404, Subpt. A, App. 1 § 3.02A. Lau's lowest and only recorded FEV was 2.51 in August 2014. R. 245. Under Listing 3.02(B), a claimant of Lau's height may demonstrate per se

disability if they have a Forced Vital Capacity (FVC) of 1.55 or lower.  20 C.F.R. Pt. 404, Subpt. A, App. 1 § 3.02B.  Here, Lau's lowest recorded FVC was 3.13.  R. 245.  In the absence of a pulmonary function test showing the required FEV or FVC, a claimant does not meet the listing. See Bomeisl v. Apfel, 1998 WL 430547, at *4 (S.D.N.Y. July 30, 1998) ("Because [claimant's] performance on the [pulmonary function tests] . . . far exceeded these values, he does not meet the criteria for Listing 3.02").  Accordingly, the ALJ correctly determined that he did not meet the Listing.

With respect to Lau's hypertension, Appendix 1 provides that it is evaluated "by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(H)(1).  In this case, there was no evidence that Lau's hypertension affected any body systems or limited Lau's activities.  See, e.g., R. 262, 265 (noting "benign hypertension").  Accordingly, we find no error in the ALJ's step three findings.  See, e.g., Garner v. Astrue, 2009 WL 903742, at *17 (S.D.N.Y. Apr. 6, 2009) (no evidence that claimant's hypertension "produce[d] any effects (primary or secondary) that severely impaired other bodily systems" precludes listings finding).

In making a determination of Lau's RFC, the ALJ evaluated the various medical opinions in the record and relied "in particular [on] the opinions of Dr. Zhang and Dr. Shen" in concluding that Lau could perform medium work with the non-exertional limitation of no more than "occasional exposure to pulmonary irritants."  R. 13.

 When assessing how much weight to give a medical source opinion, the ALJ should consider the factors set forth in the Commissioner's regulations, which include (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly

medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. § 404.1527(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).

The ALJ gave "considerable weight" to the opinions of Dr. Kuan Shen and Dr. Jian Wei Zhang, two of Lau's treating sources, because they had treated Lau prior to his last date insured and thereafter and issued opinions consistent with the record. R. 15. Dr. Shen and Dr. Zhang opined that Lau was capable of at least medium levels of exertion and, despite his cough, could tolerate exposure to dust, odors, fumes, and other pulmonary irritants "continuously." See R. 288, 291-95, 404-08. Insofar as these doctors were treating sources, their opinions were due significant weight, if not "controlling weight," so long as their opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in the [claimant's] case record." 20 C.F.R. § 404.1527(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").

Here, both sources' opinions were supported by "unremarkable" clinical and laboratory findings, see R. 288-89, 401-03; see also R. 259, 262-63, 265-66, 277, 282, 391 (exam notes from Dr. Zhang, and clinical testing and laboratory findings sent to Dr. Zhang by radiologists), and by Lau's self-reported abilities and daily schedule, see R. 44-45, 184-91. They were also supported by Lau's own testimony that declined to tie his cough to any particular physical

limitation.  R. 38-40.[5]

The ALJ also properly gave "some weight" to the opinion of consulting examiner Dr.
Linelle Skeene, R. 240-43, who opined that Lau had a "moderate limitation for general activity
due to shortness of breath accompanied by a productive chronic cough secondary to bronchial
asthma," R. 242.  Dr. Skeene noted that a pulmonary function test revealed "low vital capacity
possibly due to restriction of lung volumes," and diagnosed Lau with bronchial asthma, infiltrate
of the left lung, and hypertension.  R. 242.  The ALJ gave the opinion "some weight . . . to the
extent that the claimant's respiratory limitations are supported by the pulmonary function test
results."  R. 15.  Dr. Skeene did not note any specific limitations, however, and did not indicate
how long Lau's condition was expected to last.

The ALJ did not err in according "little weight" to Dr. Cynthia Tam, a colleague of Dr.
Shen and Dr. Zhang, who had opined in August 2012 that Lau "can not engage in strenuous
physical activity."  R. 276.  The ALJ discounted this opinion because "it [was] not supported by
objective tests or clinical findings," though he acknowledged that Lau's "documented respiratory
impairment would reasonably preclude heavy levels of exertion and would warrant a finding that

---

[5]  While Dr. Jian Wei Zhang's stamp is on the opinion, we note his signature does not
appear on the opinion or on the "General Medical Report" preceding the opinion.  Instead, the
Report and the opinion are signed by a certified physician's assistant named Yan Hang Zheng.
See R. 403, 408.  We recognize that an opinion from a licensed physician's assistant is not an
"acceptable medical source," as defined in 20 C.F.R. § 404.1502(a).  See also SSR 06-03P, 2006
WL 2329939, at *2 (S.S.A. Aug. 9, 2006) ("other sources," like a physician's assistant, "cannot
establish the existence of a medically determinable impairment . . . [but] may provide insight
into the severity of the impairment(s) and how it affects the individual's ability to function.");
Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) (summary order) ("nurse practitioners
and physicians' assistants are defined as 'other sources' whose opinions may be considered with
respect to the severity of the claimant's impairment and ability to work, but need not be assigned
controlling weight.").  The ALJ did not give the opinion controlling weight, however, and the
opinions were supported by substantial evidence regardless of who issued them.  In particular,
the opinions were consistent with Dr. Shen's views of Lau's functional abilities.

he avoid prolonged exposure to respiratory irritants." R. 14-15. We find no error in the ALJ's determination of how much weight to give Dr. Tam, even though she was a treating source. Dr. Tam's opinion that Lau could not engage in strenuous activity was, as noted by the ALJ, not supported by any clinical findings or the product of an identifiable examination, see R. 276, and is inconsistent with Lau's testimony that he exercised daily in the park, R. 185.

In any event, to the extent the opinions of Dr. Tam or Dr. Skeene merited greater weight, their opinions were consistent with the ALJ's ultimate finding that Lau was limited to no more than medium levels of exertion. R. 13.

Finally, the ALJ did not err in giving "little weight" to medical expert Dr. Osvaldo Fulco's opinion at the hearing that due to Lau's "restrictive airway disease" he "would not be able to complete an eight-hour day in the workplace." R. 56. Dr. Fulco explained that individuals working at Ground Zero "develop[ed] this condition called reactive airway disease because they basically have, like, a burn of the bronchial [tubes]." R. 56. According to Dr. Fulco, a "typical symptom of this condition is episodes of . . . cough," and "the cough is so severe that it may interfere with the ability to complete in length an eight-hour day," and that would have been true as far back as 2012. R. 56, 57. Dr. Fulco acknowledged, however, that his "opinion on this is . . . insufficiently documented" as such a disease is "usually" documented by "a test called methacholine provocation." R. 56; see also R. 59 (acknowledging that there are no clinical findings to support a diagnosis). But he felt that Lau's consistent reports of a chronic cough and testimony concerning his work at Ground Zero supported his diagnosis and functional limitations opinion. R. 56.

The ALJ rejected Dr. Fulco's opinion as to the functional limitations of "reactive airway disease," because the doctor's opinion "[was] contradicted by substantial other evidence in the

file, including the opinions of the treating physicians discussed above, and is, by his own admission, not supported by the record." R. 16. Dr. Fulco recognized that the mostly normal findings on Lau's 2012 chest x-ray, and mild abnormalities noted on pulmonary function tests, contradicted his retrospective opinion on Lau's limitations. R. 57, 59. Because Dr. Fulco's opinion was contradicted by the opinions of Dr. Shen and Dr. Zheng in addition to the opinion of Dr. Skeene, the ALJ did not err in rejecting it. See R. 242, 291-95, 404-08.

The ALJ concluded that Lau could perform work requiring a medium level of exertion, except that he could have no more than "occasional exposure to pulmonary irritants." R. 14. In addition to the medical opinions already discussed, the ALJ's finding was supported by medical tests in the record and plaintiff's self-reported abilities and activities of daily living. Lau's medical test results were repeatedly described as "unremarkable." E.g., R. 391. While chest x-rays consistently revealed a patchy infiltrate and left lower lobe patchy airspace disease, which was not growing or only "slightly increased" in size, the results did not reveal any evidence of consolidation or pleural effusion and consistently revealed clear lungs. See R. 259, 277, 282-83. Pulmonary function tests also showed no wheezing on auscultation of the chest. R. 241, 245, 279. As for plaintiff's self-reports, he complained of a chronic cough and shortness of breath, which produced a yellowish phlegm, e.g., R. 240, and monthly asthma attacks (of which the record contains no information), id., but Lau also said that he exercises daily, performs all daily chores comfortably, walks his neighborhood often during the summer, and regularly visits the library, e.g., 45, 176, 185, 241. As a result, the ALJ had substantial evidence for his conclusion that Lau could perform medium-level work but should avoid more than occasional exposure to pulmonary irritants. R. 13.

C. ALJ's Determination That Lau Could Perform His Prior Work

Lau challenges the ALJ's determination that he could return to his prior work, R. 16, on grounds that the vocational expert had said he would be unable to work if he was limited to no exposure to any pulmonary irritants, see Pl. Mem. at 6. At step four, it remains the claimant's burden to show that he can not perform his prior work. Poupore, 566 F.3d at 306.

To answer the step four inquiry, an ALJ may engage a vocational expert to opine on the jobs that a hypothetical person of the claimant's age, education, and RFC could perform in the national economy. 20 C.F.R. § 404.1560(b)(2) ("a vocational expert . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairments can meet the demands of the claimant's previous work"); accord Bapp v. Bowen, 802 F.2d 601, 606 (2d Cir. 1986) ("If nonexertional limitations significantly diminish [claimant]'s ability to perform the full range of 'light work,' then the ALJ should require the Secretary to present either the testimony of a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with claimant's limitations."). Here, the ALJ properly inquired of a vocational expert given that Lau's RFC contained the non-exertional limitation of "occasional exposure to pulmonary irritants." R. 13. The VE testified that someone of claimant's age, education, and RFC who was limited to occasional exposure to pulmonary irritants could perform Lau's past work, which involved no more than sedentary levels of exertion. R. 63-64. Lau argues that the ALJ should have deferred to the VE's testimony regarding his ability to work if he could be exposed to no pulmonary irritants, Pl. Mem. at 6, but given that the ALJ's RFC did not contain that limitation, that portion of the VE's testimony was not relevant. See McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to

support the assumption[s] upon which the vocational expert based his opinion' . . . .") (citation omitted). There was no evidence to suggest that Lau's prior work involved more than occasional exposure to pulmonary irritants. Thus, the ALJ could properly conclude that Lau could return to his past work and that therefore he was not disabled. See 42 U.S.C. § 423(d)(2)(A) (an individual is disabled only if they cannot perform his or her past work).

IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion is granted and the case dismissed. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: New York, New York
October 22, 2018

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy sent to:

Victor F. Lau
211 E. 81st Street, #4E
New York, NY 10028

Counsel by ECF